Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | Sidney I. Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8471 | **DATE** | 12/19/2001 |
| **CASE TITLE** | Commonwealth Insurance Co., *et al.* vs. Stone Container Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER. For the reasons stated in the attached memorandum opinion and order, Stone's motion to disqualify [doc. # 174] is DENIED. Stone is granted until 01/11/02 to designate an expert and to submit a report and related materials as required by Fed. R. Civ. P. 26(a)(2) to respond to the report and opinions submitted by Mr. Sugarman. The depositions of Mr. Sugarman and the responsive expert designated by Stone are to be completed by 01/31/02. All other discovery deadlines remain unchanged. The matter is set for a status conference on 02/05/02 at 9:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| ✓ | Notified counsel by telephone. | | DEC 20 2001 date docketed | 179 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | DEC 19 AM 10:58 | 12/19/2001 date mailed notice | |
| JJK | courtroom deputy's initials | Date/time received in central Clerk's Office | JJK mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| COMMONWEALTH INSURANCE CO., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 99 C 8471 |
| vs. | ) ) | Magistrate Judge Schenkier |
| STONE CONTAINER CORP., | ) ) ) | |
| Defendant. | ) ) | |
| STONE CONTAINER CORP., | ) ) ) | |
| Counterclaim Plaintiff, | ) ) | |
| vs. | ) ) | |
| NEW YORK MARINE AND GENERAL INSURANCE CO., *et al.*, | ) ) ) | |
| Counterclaim Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Stone Container Corporation ("Stone"), the defendant and counterclaim plaintiff, has filed a motion to disqualify a testifying expert (and the expert's law firm) designated by Aon Risk Services Inc., of Illinois ("Aon"): Mr. Paul W. Sugarman, a partner and shareholder of the firm Heller Ehrman White & McAuliffe, LLP ("Heller Ehrman"). Stone brings this motion seeking disqualification under Model Rules of Professional Conduct, Rule 1.7 and 1.10, which have been adopted (without changes material here) by this Court as NORTHERN DISTRICT OF ILLINOIS LR 83.51.7 and 83.51.10. Both Aon and Mr. Sugarman (hereinafter "Heller Ehrman") contest the

179

motion on the grounds that Rules 1.7 and 1.10 do not apply to testifying experts and any common law rules that permit disqualification of testifying experts similarly do not apply here because there is no evidence that any duties of confidentiality were breached by Heller Ehrman, nor that the matters on which Heller Ehrman served Stone, in the first instance, and Aon, in the second, are "substantially related."

After careful review of the parties' arguments, the ethical rules and the relevant case law, the Court denies Stone's motion to disqualify (doc. # 174), on two grounds. *First,* Heller Ehrman's engagement as a testifying expert for Aon does not create an attorney-client relationship under the ethical rules. Consequently, the ethical rules governing conflicts of interest, namely Model Rules 1.7 and 1.10, do not apply to this case by their own terms. *Second,* although the general duty of loyalty, which arises specifically under Rule 1.7, casts a broad net around a lawyer's conduct toward the client, prohibiting not only direct breaches (*e.g.,* by a breach of the duty of confidentiality – also a violation of Rule 1.6), but also the appearance of impropriety, the facts of this case do not warrant a finding that Heller Ehrman has acted improperly by allowing Mr. Sugarman to testify as an expert witness for Aon. The reasons for these two conclusions are set forth below after a brief summary of the relevant facts.

I.

In June 1997, Stone retained Heller Ehrman, through the firm's Los Angeles office, as legal counsel for a joint venture in China ("China deal") (Aon Ex. C, Stromberg Aff. ¶ 2; Stone Ex. B, Hunt Aff. ¶ 3 (indicating retainer beginning in 1998)). The responsible partner was Mr. Stromberg (Aon Ex. C., Stromberg Aff. at ¶ 2). This was Heller Ehrman's first representation of Stone (Aon Ex. C, Stromberg Aff. ¶ 3). From June 1997 through the final calendar quarter of 1999, Heller

2

Ehrman performed legal services in the representation of Stone on the China deal (*Id.* at ¶ 5). By late 1999, the China deal was completed (*Id.*). In the first calendar quarter of 2000, Heller Ehrman billed Stone for 5.50 hours of ministerial follow-up work on the China deal (*Id.*). And, in June 2000, Mr. Stromberg considered the China deal complete because no one at Stone suggested that any further work on the deal was needed or forthcoming with respect to that deal or "any other matter" (*Id.*).

From September 2000 through August 2001, Heller Ehrman's Hong Kong office performed and billed for 2.3 hours of work preparing and filing "annual returns" for the China deal. Mr. Stromberg did not discover this fact until November 2001, as a result of research done on the pending disqualification issue (Aon Ex. C, Stromberg Aff. ¶ 18).

On October 11, 2001, Rachel Perrier of Kirkland & Ellis, Aon's retained counsel in the present litigation, contacted Mr. Sugarman, who works out of Heller Ehrman's San Francisco office, to engage him as a testifying expert for Aon in this lawsuit. Aon asked Mr. Sugarman to provide expert testimony on the previous insurance litigation strategy and positions of Stone in pursuit of insurance coverage for losses arising out of the failure of a pulp digester at Stone's Panama City, Florida facility. There is no dispute here that Mr. Sugarman was engaged by Aon solely to act as a testifying expert: not as a consultant, and not as co-counsel in this matter.

Between October 11 and 18, 2001, Mr. Sugarman conducted a conflict check at Heller Ehrman. As part of this check, he discussed the proposed engagement with Aon with Mr. Stromberg, who told him that the China deal had closed and "all work for Stone [had been] completed by the end of 1999, with ministerial follow-up inquiries in the first half of 2000" (Aon's Resp. at 3). Mr. Stromberg told Mr. Sugarman that Heller Ehrman had not been asked to do any

further work on behalf of Stone since mid-2000 (Aon's Resp. at 3). Mr. Stromberg also told Mr. Sugarman that "in his view, Stone was no longer a client of Heller Ehrman; and the Stone matter was a "single, long-closed corporate deal" (Aon's Resp. at 4; Aon Ex. C, Stromberg Aff. ¶ 9). Mr. Sugarman concluded that the China deal was "completely unrelated" to the subject matter on which he had been asked to testify for Aon (*Id.*). Mr. Sugarman also concluded that he could accept engagement as a testifying expert for Aon because: (1) Stone was not a current client of Heller Ehrman; (2) Heller Ehrman's prior work for Stone was completely unrelated to the litigation strategy matters in this case; and (3) Sugarman and Heller Ehrman received no confidential information from Stone relevant to the present matter (Aon's Resp. at 4, n.4).

On October 18, 2001, Aon filed its motion for leave to designate an additional expert and disclosed Mr. Sugarman as its testifying expert witness (Aon's Resp. at 4). On October 19, 2001, Mr. Stromberg learned that Heller Ehrman had conducted a conflict check regarding Stone (Aon Ex. C, Stromberg Aff. ¶ 7). On October 30, 2001, Mr. Sugarman completed his expert report for Aon (Aon Ex. B, Sugarman Aff. ¶ 18). That same day, Aon produced Mr. Sugarman's report to Stone (Stone Mem. at 1).

On November 6, 2001, two significant events occurred (although it is not clear which event took place first): (1) Mr. Hunt, Stone's general counsel, reviewed the Sugarman report (Stone Mem. at 2), and, upon review, Mr. Hunt realized that Mr. Sugarman was a partner at Heller Ehrman (Stone Ex. B, Hunt Aff. ¶ 6); and (2) Mr. Tim Davisson, of Stone, telephoned Mr. Stromberg, of Heller Ehrman, to seek legal advice on a proposed amendment to the China deal (Stone Ex. B, Hunt Aff. ¶ 5; Aon Ex. C, Stromberg Aff. ¶ 11), which Mr. Stromberg agreed to provide (Aon Ex. C, Stromberg Aff. ¶ 11). It is not clear whether Mr. Hunt knew of and/or directed Mr. Davisson to

4

contact Heller Ehrman that day; nor is it clear whether Mr. Hunt reviewed Mr. Sugarman's expert report (and/or knew about the potential conflict) prior to Mr. Davisson's phone call.

What is clear is that on November 7, 2001, Mr. Hunt sent Mr. Stromberg a facsimile of the China deal Joint Venture Agreement (dated March 16, 1998) (Stone Ex. B-4 (Stromberg letter dated 11/09/01)). And, on November 8, 2001, at Mr. Hunt's direction, Ross & Hardies (counsel for Stone in the present litigation) contacted Kirkland & Ellis (counsel for Aon); asserted a conflict of interest between Heller Ehrman's work for Stone and Mr. Sugarman's engagement as a testifying expert in this case; and demanded the withdrawal of Mr. Sugarman (and thus Heller Ehrman) as Aon's testifying expert (Stone Ex. B, Hunt Aff. ¶ 8). Aon rebuffed Stone's demand, denying any conflict and refusing to withdraw their designation of Mr. Sugarman (*Id.*).

On November 9, 2001, several telephone calls and letters were exchanged between the parties. Early in the day, Mr. Hunt telephoned Mr. Stromberg at Heller Ehrman seeking explanation for the firm's acceptance of an engagement as Aon's testifying expert. Mr. Hunt indicated that Stone perceived the relationship between Stone and Aon to be directly adverse with respect to Heller Ehrman's representation of Stone. Mr. Hunt also indicated that Mr. Stromberg told him the conflict Heller Ehrman perceived was not with Aon, but with Stone, and as a result he had decided to decline "continued representation" of Stone with respect to the China deal (Stone Ex. B, Hunt Aff. ¶ 9).

Immediately after this telephone call with Mr. Hunt, Mr. Stromberg sent a letter to Stone (addressed to Tim Davisson), returning the China deal documents (dated from July 19, 2001 through October 25, 2001) faxed to him on November 6, 2001, when Stone requested legal advice from Stromberg regarding the proposed amendment. In this letter, Mr. Stromberg also informed Stone that it had ceased its representation of Stone prior to Stone's request for legal counsel on November

5

6, 2001 (which he characterizes as a "new engagement"). In the letter, Mr. Stromberg implies (but never directly states) that Heller Ehrman's representation of Stone ended at the close of the China deal. He also states in the letter that Heller Ehrman had, since the close of the China deal, acted as "an expert witness in unrelated litigation to which Stone [was] a party" for another client. There is no indication from the letter that Stone ever raised a conflict issue with respect to that client or in that litigation (Stone Ex. B-4).

On November 12, 2001, Mr. Hunt wrote a responsive letter to Mr. Stromberg, stating that he was "astonished" by Heller Ehrman's position with regard to Stone (*i.e.*, its view that the attorney-client relationship between Heller Ehrman and Stone had been terminated) given Stone's view that Heller Ehrman had "performed services consistently for over three years" (Stone Ex. B-5, Hunt letter of 11/12/01). Mr. Hunt also made clear that Stone believed its engagement as a testifying expert "constitutes the representation of a party adverse to an existing client [*i.e.*, Stone]" (*Id.*). Mr. Hunt concluded his letter by demanding return of all information related to "insurance coverage" in Heller Ehrman's possession (*Id.*).

In a telephone conversation later that day, according to Mr. Hunt, Mr. Stromberg stated that Heller Ehrman had never terminated its attorney-client relationship with Stone and was still acting as Stone's legal counsel. Mr. Stromberg also indicated that, based on legal research done since November 9, 2001, he believed there was no conflict between the representation of Stone as a client and Aon as a testifying expert "because Mr. Sugarman's legal work for Aon in this case was not adverse to Stone Container" (Stone Ex. B, Hunt Aff. ¶ 11). Mr. Sugarman then offered to continue to represent Stone with respect to the China deal (*Id.*) – an offer that Mr. Hunt declined.

6

## II.

Based on these facts, Stone claims a current representation of Stone by Heller Ehrman (as opposed to a former one), and seeks disqualification of Mr. Sugarman and Heller Ehrman as a testifying expert for Aon based on Model Rules 1.7 and 1.10. Stone seeks disqualification under Rule 1.7(b) on the theory that a lawyer/law firm owes an "undivided duty of loyalty" to a client, even when the duty of confidentiality is not breached, and even when the matters for which the firm seeks to offer its services are not substantially related (*e.g.*, Reply at 6, 9-12). In other words, Stone argues that Heller Ehrman's engagement with Aon breaches the duty of loyalty, and this breach constitutes a "material limitation" on Heller Ehrman's ability to represent Stone in the China deal under Rule 1.7(b) (Reply at 6). Consequently, argues Stone, Heller Ehrman should be disqualified because its engagement with Aon creates, at a minimum, the appearance of impropriety and thus a conflict of interest under Rule 1.7(b) that can and should be imputed to Mr. Sugarman's law firm, Heller Ehrman, under Rule 1.10, because Stone was never asked to consent, nor did it consent to, the engagement (Reply at 7-12).

Despite Heller Ehrman's earlier assertion that its representation of Stone had ceased, for purposes of this motion, Aon and Heller Ehrman assume that Heller Ehrman's representation of Stone was current as of the time of Mr. Sugarman's engagement by Aon (Aon Resp. at 1). Given that assumption, Aon argues that Model Rules 1.7 and 1.10 do not apply in the present case because Heller Ehrman serves Aon as a testifying expert, not as an attorney; and, as such, the ethical rules, by their own terms, do not apply because there is no attorney-client relationship between Heller Ehrman and Aon. Aon argues there is no such relationship because: (1) Heller Ehrman is not providing any legal services to Aon; and (2) there are no expectations of confidentiality in the

7

relationship between Heller Ehrman and Aon, and thus no privilege that can attach to the communications between Heller Ehrman and Aon. Moreover, Aon argues that there are no common law rules that apply to disqualify Heller Ehrman, since there are no issues of confidentiality in this case (Aon Resp. at 2). We agree with Aon.

### III.

We begin our analysis with the recognition that "[c]lients and the public will not repose confidence 'in lawyers whom they distrust and will not trust law firms that switch sides nimbly.'" *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1269 (7th Cir. 1983). "The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration . . . that a court may disqualify an attorney for failing to avoid even the appearance of impropriety." *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978).

At the same time, we recognize that motions for disqualification "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman v. Chicago Musician Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982). For this reason, "disqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993) (quoting *Schiessle v. Stephens*, 717 F.2d 417-419 (7th Cir. 1983)). The moving party "bears a heavy burden of proving facts required for disqualification." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir. 1983) (cited with approval in *Guillen v. City of Chicago*, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997)).

With these principles in mind, we address the question before us: whether the Rule 1.7(b) precludes a law firm that is currently representing a client from accepting a concurrent engagement

8

to act as a testifying expert for a third party who is an adversary of the client in unrelated litigation, when there is no evidence that any confidential communications could or would be shared. In this case and on the facts before us, the Court believes that the answer to this question is no.

### A.

We begin by addressing the threshold question of whether a lawyer's engagement as a testifying expert constitutes "representation" of a client within the meaning of Rules 1.7 and 1.10. The Court concludes that it does not.

Rule 1.7 states in relevant part:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> > (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> > (2) each client consents after disclosure.
>
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> > (1) the lawyer reasonably believes the representation will not be adversely affected; and
> > (2) the client consents after disclosure.

*See, e.g.,* N.D.Ill.L.R. 83.51.7. Rule 1.10 states, in relevant part:

> (a) No lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with that firm would be prohibited from doing so. . . .

The language of Rules 1.7 and 1.10 speaks only to situations involving the *representation* of clients in an attorney-client relationship. However, when a law firm undertakes the role of

9

testifying expert for a client, this undertaking, or "engagement," does not form an attorney-client relationship and thus does not constitute a representation within the meaning of the ethical rules. While there is a dearth of judicial authority addressing this point, the Court finds persuasive an ABA formal opinion considering this very question.

ABA Formal Opinion 97-407 concludes that "[a] lawyer serving as an expert witness to testify on behalf of a party . . . does not . . . establish a client-lawyer relationship with the party or provide a 'law related service' to the party . . . such as would render his services as a testifying expert subject to the Model Rules of Professional Conduct." In reaching that conclusion, the ABA opinion drew a distinction between the lawyer who acts solely as a testifying expert and one who acts more generally as a consultant:

> [T]he question whether a testifying expert and the party for whom he is expected to testify have formed a relationship sufficient to invoke the ethical obligations of the Model Rules is generally a question of fact determined by principles beyond those set forth in the Model Rules. . . . . The Committee believes, however, as long as the lawyer's role is limited to service as a testifying expert . . . the client of the law firm which has engaged the testifying expert's services cannot reasonably expect that the relationship thus created is one of client-lawyer. . . . Moreover, [a testifying expert] may be deposed by the opposing party [and] [c]ommunications between the expert and the retaining law firm or its client employed by the expert in preparing his testimony ordinarily are discoverable.

*Id.*, at 1101:133.

This analysis is consistent with the fact that under Fed. R. Civ P. 26(a)(2), the communications between a testifying expert and the party retaining that expert are not privileged. *See Simon Property Group v. mySimon, Inc.*, No. 99-C-1195, 2000 WL 1206575 (S.D. Ind. Aug. 3, 2000); *Barna v. United States*, No. 95 C 6552, 1997 WL 417847 (N.D. Ill. Jul. 23, 1997); *see also* 8 WRIGHT, MILLER, MARCUS, FEDERAL PRACTICE AND PROCEDURE, § 2016.2. The Committee

10

notes to Rule 26(a)(2) make clear that this was the purpose of the Rule: "[g]iven [the] obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions . . . are privileged or otherwise protected from disclosure when such persons are testifying or being deposed." Thus, there can be no expectation of confidentiality between Heller Ehrman and Aon, which is a core element of an attorney-client relationship. *See, e.g., United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (citing as an essential element of attorney-client privilege that a communication must be "made in confidence"). *See also In re Ford Motor Co. v. Ford Motor Co.*, 110 F.3d 954, 962 (3d Cir. 1997) (the attorney-client privilege and work product doctrine are dependent upon the right to confidentiality of commucation and documents).

When a lawyer is engaged as a testifying expert, that lawyer is not being asked to perform the traditional role of a lawyer in providing legal advice. Rather, the lawyer is being asked to do what an expert in any subject matter is asked to do: to review materials or do other investigation, draw on the expertise derived for the expert's discipline, and to offer opinions on a particular point that is relevant to the case. The lawyer is not being asked to plot overall strategy or otherwise consult about the course of a lawsuit – and it would be foolish for the retaining party to use a testifying expert in that way, as the communications would be an open book, available for the opponent to review.

Without a request for legal advice or any expectation of confidentiality, we find that the engagement between testifying expert and the retaining party does not form an attorney-client relationship within the meaning of the ethical rules. Here, there is no dispute that Aon engaged

Heller Ehrman only to be testifying expert – and nothing more. Thus, the Court holds that Heller Ehrman and Aon do not have an attorney-client relationship.

### B.

We now address the significance of that point to Stone's motion, given the scenario presented here: when a law firm first represents a client (here Stone) and then concurrently undertakes an engagement to act as a testifying expert for another party (here Aon). In that situation, Rule 1.7 – by its terms – does not apply.

Rule 1.7(a) speaks to the situation where there is dual *representation* of clients who are directly adverse. *See, e.g., MC3D*, 1998 WL 831806, at * 1-2. That is not the present situation, since (1) Aon is not "represented" by Heller Ehrman; and (2) Aon and Stone, although directly adverse in the present litigation, are not directly adverse with respect to Heller Ehrman's representation of Stone in the China deal and Heller Ehrman's engagement with Aon as an expert in this litigation.

Rule 1.7(b) speaks to the situation where a lawyer first incurs "responsibilities to" a client or a third-party, and while those responsibilities still are ongoing, seeks to represent a client in an attorney-client relationship. *See, e.g., Cinema 5*, 528 F.2d at 1386; *Ransburg*, 648 F.Supp at 1043. In that scenario, the lawyer *may be* prohibited under 1.7(b) from representing the second client in an attorney-client relationship if the firm's responsibilities and duties to the third-party would "materially limit" its representation of (or advocacy for) the potential second client. *See Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F.Supp.2d 579, 582 (D. Del. 2001) ("an impermissible conflict is *not always* created when a simultaneous representation concerns an unrelated matter and involves clients whose interests are only generally adverse"). But that scenario does not describe

12

this case, because the representation of the client (Stone) came first and the engagement as a testifying expert for a third party (Aon) came second. We believe that the express language of Rule 1.7(b) makes that distinction significant.

Rule 1.7(b) states: "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to . . . a third person . . . ." This language assumes that the law firm's order of engagement is as the testifying expert first and then as the lawyer second. The rule therefore asks the lawyer to determine whether potential representation of the new client would be "materially limited" by the responsibilities inherent in the prior relationship: whether to a "client" (which refers to an attorney-client relationship) or to a "third person" (which would embrace engagements other than attorney-client relationships, such as where an attorney acts as a testifying expert).[1] The "material limitation" that Rule 1.7(b) is concerned with focuses on the attorney-client relationship and the duties and responsibilities inherent in such a representation. Rule 1.7(b) applies, and a conflict of interest arises, only because the attorney-client relationship, and the duties inherent in it, exist. Thus, if a lawyer is materially limited in his or her ability to fully

---

[1] Stone has not cited and the Court has not found any cases that apply Model Rule 1.7(b) to disqualify a lawyer/law firm from engagement as a testifying expert witness, even when that same firm has a current representation with a client who is adverse to the party engaging the firm as a witness. Many of the cases Stone relies upon to make its Rule 1.7(b) and "undivided loyalty" points are cases of "dual representation" between two clients who each would have expectations that arise from an attorney-client relationship, and the other cases simply do not apply here. *See, e.g., Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 229 (7th Cir. 1978) (duty of loyalty may require disqualification where lawyer concurrently *representing adverse clients*). *See also Mustang Enterprises, Inc. v. Plug-In Storage Systems, Inc.*, 847 F. Supp. 881, 886 (N.D. Ill. 1995) (Shadur, J.) (affiliated firms – concurrent representation). *Ransburg v. Champion Spark Plug Co.*, 648 F. Supp. 1040, 1045 (N.D. Ill. 1986) (Holderman, J.) (finding it unethical for attorney "to participate in any lawsuit" against "his own client" without consent) (disqualifying law firm even though its dual representations were unrelated). *See generally IBM v. Levin*, 579 F.2d 271, 280 (3d Cir. 1978) (concurrent representation); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976) (concurrent representation); *In re Dresser Industries, Inc.*, 972 F.2d 540, 545, 546 n. 13 (5th Cir. 1992) (concurrent representation); *Platt v. Superior Court*, 885 P.2d 950 (Cal. 1994) (concurrent representation).

represent a client by responsibilities to a third party, then there is a "conflict of interest" that would preclude the representation.

This is precisely how ABA Formal Opinion 97-407, cited by the parties in support of their respective positions, interprets this rule. The 1997 Opinion addresses the situation where a law firm concurrently serves both as a testifying expert and an attorney for two different parties. However, the 1997 Opinion only addresses the situation where the law firm's engagement with the testifying expert comes first in time to representation of a client in an attorney-client relationship. The ABA opinion does not address the situation here, where the law firm's engagement as an expert follows the attorney-client relationship with a client. And the language of the rule itself does not cover this scenario.

Thus, the present situation requires the Court to look beyond the literal terms of Rule 1.7, and the 1997 Opinion interpreting it, to the "spirit" of the rule. When one looks to the substance rather than the form of the ethical rules, and the goals these rules establish for the practice of law, the question becomes whether Heller Ehrman's engagement as a testifying expert for Aon breaches the duty of loyalty it owes to Stone as a concurrently-represented client, or creates an appearance of impropriety. We address that point below.

### C.

"Rule 1.7 is about an attorney's loyalty to his or her clients." *Alex Munoz General Contractor, Inc. v. MC3D, Inc.*, No. 98 C 4489, 1998 WL 831806 (N.D. Ill., Nov. 25, 1998). It is this duty of loyalty that Stone now argues Heller Ehrman has breached by accepting engagement to act as a testifying expert for Aon (Stone's Reply at 5-6). Stone argues that this duty has been

14

breached by creating the appearance of impropriety and thus Heller Ehrman should be disqualified (*Id.*).

The Committee Comment to Rule 1.7 states, in relevant part:

> ***Committee Comment.*** *Loyalty to a Client.* Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. * * *
> 
> As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without the client's consent. . . .Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic representation of one client, does not require consent of the respective clients. . . .
> 
> Loyalty is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interests involved.
> * * *
> *Other Conflict Situations.* Conflicts of interest in contexts other than litigation sometimes may be difficult to assess. Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that actual conflict will arise and the likely prejudice to the client from the conflict if it does arise. The question is often one of proximity and degree.

As we read the Comment to Rule 1.7, the duty of loyalty to a represented client should always raise a question in the mind of an attorney who subsequently seeks to concurrently serve as a testifying expert for a third-party who is adverse to the client. A testifying expert is (at least theoretically) objective – hired only to evaluate evidence and/or information, rather than to strategize

and/or utilize this information to advocate in favor of the third-party and against the client. *E.g.*, *EEOC v. Locals 14 and 15*, No. 72 C 2498, 1981 WL 163 (S.D. N.Y., Feb. 11, 1981). Nonetheless, we can envision situations in which the testifying expert's firm, by virtue of its representation of the client, may possess client confidences that could be used to the client's detriment. Moreover, even apart from specific confidences, by virtue of representing a client, an attorney may possess certain "institutional knowledge" about the client that could assist the client's adversary. For example, the lawyer may be privy to the client's decision-making process that could give the adversary a leg up in litigation against the client.

To be sure, Rule 1.6 prohibits the sharing or use of confidential information and thus protects the client when a firm later accepts a representation that is adverse to the client: and we emphasize, again, that there is no claim that Heller Ehrman has revealed any of Stone's confidences to Aon or its trial counsel. But there is some force to the theory espoused by Stone, namely, that "[i]t is no comfort to a client to learn that his attorney appears against him – not as an attorney advocate, but as an attorney expert consultant and witness" (Stone's Mem. at 4). *See, e.g., Mustang*, 874 F.Supp. at 889 ("For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public – or for that matter the bench and the bar . . . . Clients will not repose confidences in lawyers whom they distrust and will not trust firms that switch sides as nimbly as the firm in this case").

The problem with Stone's position (and it is a significant one) is that the undisputed facts of this case do not support a finding of conflict. In reaching this conclusion, we take into account the considerations laid out in the Comment to Rule 1.7 for "other conflict situations," keeping in mind

16

the guidance in the commentary that the question of whether a conflict exists is "often one of proximity and degree."

1.

We begin by looking at the "duration and intimacy" of Heller Ehrman's relationship with Stone. It is undisputed that Heller Ehrman represented Stone in a single transaction, the China deal. While that representation commenced in June 1997, it was largely completed by the end of 1999: less than ten hours were billed to the file after the end of 1999, with only 2.3 of those hours coming between September 2000 and August 2001. Thus, while Aon concedes for purposes of this motion that Heller Ehrman's representation of Stone was not terminated at the time and engaged Heller Ehrman as a testifying expert, it nonetheless is the case that Heller Ehrman's representation of Stone was inactive.

Thus, we are not presented here with a situation where Heller Ehrman represented Stone on a variety of matters, over a lengthy period of time, such that it could be characterized as Stone's "outside general counsel." Nor is it a situation where Heller Ehrman's representation of Stone on a single matter was so intensive, and brought Heller Ehrman into such intimate and extensive contact with Stone and its operations, that it could be said that Heller Ehrman gained an understanding of Stone's business activities that could be used to Stone's detriment in Heller Ehrman's engagement by Aon.

2.

When we look at the functions being performed by Heller Ehrman and its representation of Stone, they involve activities that appear far afield from the matters involved in this lawsuit. This lawsuit, of course, involves litigation over questions of insurance coverage. By contrast, Heller

17

Ehrman's representation of Stone involved transactional rather than litigation matters, and involved overseas corporate affairs rather than insurance coverage issues. There is no contention here that, by virtue of its representation, Heller Ehrman gained knowledge of Stone's insurance coverage practices at all.

### 3.

These two foregoing considerations make it extremely remote that any actual conflict could arise. Because the China deal and this lawsuit are completely unrelated matters, there is nothing about the specifics of what Heller Ehrman learned in working on the China deal that could be used to Stone's detriment in this lawsuit. Moreover, because the nature of Heller Ehrman's representation of Stone was limited, there is no "institutional knowledge" that Heller Ehrman could have gained of Stone's practices generally, and its insurance practices in particular, that Heller Ehrman could use to Stone's disadvantage in this litigation.

Moreover, the likelihood of an actual conflict is rendered even more remote by the fact that neither Mr. Sugarman, the testifying expert, nor the San Francisco office of Heller Ehrman out of which he works, had any involvement or knowledge whatsoever in the work done on the China deal. We recognize that in a "true conflict" setting governed by Rule 1.7, Rule 1.10 provides that when one lawyer from a firm is barred from the representation, the entire firm often is likewise barred. But we are not presented here with a true conflict situation, and in this setting, we believe the fact that separate lawyers and offices of Heller Ehrman are involved in the representation of Stone, on the one hand, and the engagement by Aon as a testifying expert, on the other hand, is a consideration that renders any likelihood of an actual conflict even more remote.

## CONCLUSION

We agree with the observation in the commentary to Rule 1.7 that there are situations in which a conflict of interest "may be difficult to assess." We do not question the right of Stone, as a client, to approach Heller Ehrman and demand that it cease its work for Aon – and to fire Heller Ehrman as Stone's lawyer if Heller Ehrman declines to do so.

But, the question presented here is whether Stone, under the force of the ethical rules, is entitled to have the Court compel Heller Ehrman to withdraw from the engagement by Aon. For the reasons stated above, we do not believe that Stone is entitled to that "drastic measure," *Owen*, 985 F.2d at 317. The Court finds that Heller Ehrman's engagement solely as a testifying expert in this insurance litigation, a matter that is completely unrelated to Heller Ehrman's limited representation of Stone in an overseas transactional matter, does not violate either the express terms or the spirit of Rules 1.7 and 1.10, and does not create an appearance of impropriety. Accordingly, the Court denies Stone's motion to disqualify (doc. # 174).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: December 19, 2001